## LOEWY et al. v. A. ROSENTHAL, Inc.
### No. 8387.

United States District Court
E. D. Michigan, S. D.
March 31, 1952.

Henry T. Synek, Chicago, Ill., Armstrong, Essery, Helm & Marshall, Detroit, Mich., for plaintiffs.

Friedman, Meyers & Keys, Detroit, Mich., for defendant.

KOSCINSKI, District Judge.

Plaintiffs, industrial designers, filed this suit to recover balance due them for serv-

ices rendered to defendant, which extended for a period of approximately one year, at the end of which it is claimed by plaintiffs that defendant abandoned the project which was the subject of the service contract here in question.

Besides their office in Chicago, plaintiffs maintain offices in New York, Los Angeles, South Bend, and London, England. As industrial designers they serve a variety of clients and furnish them with creative ideas relating to their products, the area in which such products are sold, and packaging of such products.

One of the divisions in plaintiffs' organization is a Retail Planning and Development Division which is primarily concerned with store planning. Its function is to aid the store owner in solving his merchandising problems such as types of merchandise to be handled, area to be devoted to various types of merchandise in the store, and, from data available to them, to compute what profits may be expected by handling certain categories of merchandise in certain areas. Plaintiffs lay out the physical area in which the merchandise is to be sold; they likewise make designs for fixtures to be utilized. As industrial designers their work also includes designs and plans relating to the general appearance of the interior and exterior of the building.

Defendant is a corporation which owns and operates a merchandising store, consisting principally of women's apparel, at 48 N. Saginaw, Pontiac, Michigan, under the name of "Arthur's". Arthur Rosenthal, whose name the defendant corporation bears, is the dominant individual in the corporation. The store building contained a first and second floor, mezzanine, and basement.

With a view of modernizing its store and increasing the volume of its business, defendant entered into a contract with plaintiffs, engaging plaintiffs' services in effectuating its plans. The contract is in the form of a letter from plaintiffs to "Arthur's", dated October 8, 1947, signed by Robert D. Tyler, in charge of plaintiffs' office. Acceptance by defendant of the terms of the contract is indicated by the words, "Ac-cepted: Arthur's, by Arthur Rosenthal, November 10, 1947." The contract resulted from a series of conferences and correspondence between Arthur Rosenthal and Robert D. Tyler.

Pertinent provisions of the contract are in the following language:

*Phase I—Survey and Recommendations.*

Review and comparison of defendant's production on volume figures with projected goal figures determined by plaintiffs and adjustment of departmental areas and locations accordingly. Results of the survey were to be presented in form of block plans indicating departmental areas, traffic circulation and non-selling areas with recommendations.

*Phase II—Fixtures Layout, Design and Detailing.*

Based on study and decisions arrived at under Phase I, plaintiffs to prepare plans determining fixture layouts on all floors. Preliminary estimate then to be obtained and upon acceptance, plaintiff to proceed with design and working drawings of fixtures, employing present fixtures wherever possible.

Color treatment and lighting to be recommended in addition.

Also included under this Phase, to be the design and detailing of the store front and whatever additional work above the first floor can be included under the budget, which was to be in the neighborhood of $50,000, exclusive of fees and floor coverings.

Plaintiffs to assist defendant in obtaining bids, letting contracts, and to make three supervisional trips. If work proceeds with normal dispatch it could be completed by March 1, 1948.

*Compensation:*

(a) For work under Phases I and II, plaintiffs to be paid a design fee of $3000 plus costs, which shall consist of actual cost of designers' and draftsmen's time, plus 100% for overhead. Maximum charge for fee and costs not to exceed 15% of all work and items included in drawings and specifications or purchased under plaintiffs' supervision, except floor covering.

(b) On approval of rough fixtures layout, space allocation, and design sketches, plaintiffs to obtain as accurate an estimate as possible of ultimate cost. Plaintiffs would not proceed with working drawings and details until this estimate was approved by defendant. If not approved and work abandoned by defendant at that stage, plaintiffs to be reimbursed for cost of designer's time plus 200% for overhead and profit, but not in excess of $3,000.

(c) If after receiving defendant's approval of estimate, plaintiffs proceed with working drawings and details and defendant later abandons work and cancels contract before construction contracts are let, then plaintiffs to be reimbursed for cost of designers' and draftsmen's time, plus 200%, but not in excess of $6,500.

(d) "All ceilings established for compensation shall not apply" if it becomes necessary for plaintiffs to redesign or redraw, at defendant's request, any portion of the work previously approved by defendant.

*Expenses:*

Travel expenses for out-of-town trips, involving overnight stay, to be billed at $12 per diem, otherwise at $6 per diem. Transportation charges to be billed at cost. "Should the nature of the work be such as to require consultation with mechanical or electrical engineers", fee for these engineering services to be charged to defendant at cost.

*Methods of Payment.*

Monthly payments. Billing of all costs and services to be rendered in itemized form.

Plaintiffs proceeded with the work under the contract and sent their representative to Pontiac to confer with Arthur Rosenthal and on February 7, 1948, in a letter to plaintiffs, Rosenthal authorized them to proceed with the working drawings as per the original contract. At that time the cost estimate for the proposed remodeling was submitted as approximately $57,000, which included store front, stair changes, electrical work, changes in air conditioning (approximately), carpeting, furniture, decoration, fixtures and installation.

According to the testimony, only minor changes were originally contemplated in the air-conditioning system, to allow for changes in relocating the merchandising areas, and utilizing the existing air-conditioning system. However, after discussions in Pontiac with Rosenthal, he requested substantial changes in this respect, in view of inadequacy of the existing equipment. Discussions were also had with reference to heating changes, and on March 16, 1948, plaintiffs advised defendant by letter that they would send Mr. Wohlfarth, their consulting engineer, to make a survey on the heating, ventilating and air-conditioning problems, and recommendations. Wohfarth performed these services for which he billed plaintiffs in the amount of $504. This amount was paid by plaintiffs.

Designs for changes in the store front were prepared and submitted to defendant. These designs were prepared by Ray Stuermer, an architect with offices in the same building as that occupied by plaintiffs in Chicago. Such preliminary designs were not drawn for construction purposes but merely as pictorial representations of suggested changes in the appearance of the store front. Stuermer was frequently consulted by plaintiffs on matters of this nature. He submitted bills to plaintiff for this preliminary work on the basis of an hourly rate for himself and his employees, and these were, in turn, included in an itemized bill from plaintiff to defendant, prior to January, 1948.

About this time, Rosenthal visited plaintiffs' offices in Chicago and informed Tyler that he desired to have plaintiffs take care of all details and supervision on the entire project. Plaintiff informed Rosenthal that actual construction plans and specifications would have to be prepared by an architect, and, if Rosenthal did not have an architect of his own choice, Tyler would recommend Stuermer whose services plaintiffs found satisfactory on previous projects of like nature. At a conference attended by Tyler, Rosenthal and Stuermer, the latter was authorized by Rosenthal to prepare all plans and specifications for the alteration to the front, including show windows and entrance, and other archi-

tectural or mechnical work necessary for completion of the job. Stuermer and Tyler assured Rosenthal that the fee would be the usual fee for architectural work of this kind and Stuermer later arrived at an agreement with Tyler, whom he considered as Rosenthal's agent, that the fee should not exceed 12% of the cost of the work covered in the drawings and specifications, deducting therefrom any preliminary design cost previously charged on the basis of hourly rates for Stuermer and his employees.

After January, 1948, no monthly charges were made by plaintiffs to defendant, or by Stuermer to plaintiffs, on an hourly basis for work done by Stuermer and his emloyees. Hourly rate billings commenced again in May 1948, but consisted of work on revisions and not on the original plans and specifications. Charges for preparation of architectural plans and specifications were made periodically by the architect to plaintiffs, as the work progressed, and were paid. On April 1, 1948, Stuermer's bill of $1600 on account of such work was submitted by plaintiffs together with their own itemized bill to the defendant.

Immediately after the Chicago conference in January, 1948, the architect began inquiries with reference to obtaining a Michigan license for practice of architecture in the state, obtained from the proper authorities in Michigan a copy of the Registration Act for Architects which stated he was exempt from the provisions of the Act as to practice in Michigan not in excess of sixty days in any calendar year but would otherwise have to be licensed. He applied for a license and received a certificate in the mail on March 25, 1948.

When the working plans for fixture drawings were from 85% to 90% complete, defendant requested substantial changes as to fixtures on one side of the first floor, considerable changes in the second floor fitting room area, changes in location of wrappings desks, and also changes in the basement where offices were located, as well as installation of additional plumbing in the basement. Discussion on various changes appears in exchange of correspond-

ence between the parties, offered in evidence.

Although the original work was intended to be completed about March 1, 1948, changes delayed the program and various additions increased the over-all cost of the project by May 12, 1948, to $79,255 or approximately $70,000 with certain suggested eliminations in the project plans.

Revised sketches of the store front were requested by defendant, changing the window arrangement, and correspondence offered in evidence indicates that defendant was advised that changes in plan of the store front and second floor would affect costs to some extent.

Both parties began to express concern in their conferences and correspondence— Rosenthal because of the cost of the entire project and plaintiffs' fees, and plaintiffs, because of the staggering amount of work involved in constant revision of plans, defendant's failure to make definite decisions, and resulting delays in meeting deadlines. Rosenthal apparently proceeded on the assumption that the original fees as shown in the contract were still operative, and that fees of persons consulted professionally would be included in the over-all fee of plaintiff. On June 8, 1948 plaintiff called Rosenthal's attention, in a letter, to the provision in the contract with reference to ceilings being inoperative and asking for authorization to proceed with the revisions at additional charge. Plaintiffs offered an illustration in the letter if total cost of the work was $80,000, resulting in a 15% ceiling of $12,000 in fees and costs, and revisions requested by defendant totalled $2000, costs of work in addition to work of, say $11,800 previously rendered, the ceilings would not operate but plaintiff would be entitled to a total fee of $13,800 in such case.

On June 10, 1948, Arthur Rosenthal, by wire to plaintiff, authorized the extra cost of revised front and second floor.

Plaintiffs again proceeded with the work but were requested by defendant in July, 1948, to consider the advisability of installing an elevator and constructing a third floor; estimates were obtained which

increased the cost of the total project to $205,000.00, plus fees. Drawings were submitted showing the possible location of elevator with suggestions on other changes necessitated by readjustment of areas to permit installation of the elevator. At first both the elevator and addition of the third floor were abandoned, and plaintiff continued with work on such assumption, but on August 10, 1948, Rosenthal instructed plaintiffs by telephone to revise the plans to include an elevator.

The total cost of the project, exclusive of fees, had now risen to approximately $124,000.00. Rosenthal called plaintiffs' Chicago office and informed them that he was unable to go ahead with the job as someone close to him was in financial trouble and he intended to furnish financial assistance to such person. At the same time Rosenthal asked plaintiffs to submit a statement in full for their services and expenses, assuring them that he had no criticism of their work.

Defendant, in its answer to plaintiffs' charges, on file in this cause, denies that plaintiffs performed their work in accordance with the terms of the contract in view of the fact that the modernization program was allotted a budget of approximately $50,000 while the estimate ultimately presented by plaintiffs was in excess of $124,000. Defendant also denies that it approved the working drawings, that plaintiffs furnished plans for a project which defendant contemplated in its contract with plaintiffs, or that it authorized plaintiffs' to engage the services of an architect or an engineer. It is the claim of defendant that the modernization project was abandoned for the reason that the estimate far exceeded the contemplated cost. It also contends that if plaintiffs are entitled to any payment, such payment is limited to the ceilings provided in the agreement, except as to actual cost of revisions authorized.

Defendant further denies that plaintiffs are entitled to recover anything on the contract for the reason that such contract is unenforceable, void and contrary to public policy, since it requires the performance of architectural services and none of the plaintiffs are licensed to practice architecture in the State of Michigan as required by Act 240 of the Michigan Public Acts of 1937, as amended, being Secs. 18.84(1), 18.84(17), Michigan Statutes Annotated, 1949 Cum.Supp.

During the trial of the case a stipulation was filed by counsel agreeing that plaintiffs expended the sum of $144.40 for costs of photostats, blue-prints, etc., that travel expenses of $609.28 were incurred by plaintiffs, that engineering costs of $504.00 were paid, and that wage cost of plaintiffs' employees on the project, on an hourly basis (without admitting that such employees were engaged in designing or drafting, in whole or in part) amounts to $4,338.34. This amount excludes charges previously made to defendants in monthly statements for services rendered by the architect and his employees on preliminary design work and revisions.

To date defendant paid to plaintiffs the sum of Six thousand four hundred eighty-five and 65/100 ($6,485.65) Dollars on account of their services.

Rosenthal's son participated in many of the conferences with plaintiffs and was present in court throughout most of the trial but was not called as a witness by defendant, nor was any oral testimony offered at the trial on behalf of the defendant.

Plaintiffs claim their work on the project was completed with the exception of supervision of construction and that under the provisions of the contract they are entitled to recover from defendant the total hourly salary cost of $4,338.34 plus 200% mark-up for overhead costs and profit, engineering fees of $504.00 paid by them on behalf of defendant, travel expense of $609.28, costs of blue-prints, etc., of $144.40, and architectural fees and costs which they have paid in the amount of $2694.18 and those for which they have obligated themselves in the sum of $1342.65, or a total of $18,309.53 together with interest at 5% from the date of the cancellation of the contract and costs of this suit, less a credit of $6485.65.

The contract of the parties provides for methods of payment at different stages of completion, with ceilings in each case, but

contains a specific provision that ceilings are inapplicable if it becomes necessary to redesign or redraw, at defendant's request, any portion of the plans previously approved by defendant.

■ Obviously, such ceilings were all based on the cost of the entire project as originally contemplated, requiring presentation of an approved plan for the work and detailing thereof, and could not be construed to apply in a case, as here, where substantial changes were requested involving complete redesigning and detailing of large portions of the project. As to some areas in the store the changes, for all practical purposes, resulted in abandonment of previous plans and presentation of new designs and plans.

The contract included a provision for payment of a design fee, plus costs, if the entire program, as originally planned, reached completion. If the project were abandoned and the contract cancelled before completion, the value of plaintiffs' services was estimated at cost (previously defined in the contract as the actual hourly wage cost of designers' and draftsmen's time plus 100% for overhead) and 100% of hourly cost for profit.

■ Since the first standard mentioned in the contract for measuring the value of plaintiffs' services (design fee of $3,000 plus costs, the total not to exceed 15% of the cost of the project) would not furnish a measuring rod, inasmuch as the project was re-designed more than once and these changes necessitated additional journeys from Chicago to Pontiac, and further consultations, the only other standard of computing the value of such services, set up in the contract, is that adopted by plaintiffs, which is the actual hourly wage cost plus 200% for overhead and profit.

The stipulated hourly wage cost amounted to $4,338.34, which, together with the 200% mark-up, totals $13,015.02, and plaintiffs are entitled to recover this amount under the contract.

The claim for cost of blue-prints and other incidentals must be denied as not within the terms of the contract. Cost is defined in the contract as consisting of, not merely including, actual hourly wage cost and 100% for overhead, and it must be assumed that any other cost, including these incidentals, was intended to be absorbed in the overhead.

Plaintiffs are also entitled to recover travel expenses, as provided in the contract, in the stipulated amount of $609.28.

Engineering fees, under the terms of the contract, were to be billed at cost and plaintiffs have shown that they paid on behalf of defendant the sum of $504 for such services, and are entitled to reimbursement in that amount.

■ No provision is made in the contract for architectural services but plaintiffs proved to this court's satisfaction that a subsequent oral agreement for such services was reached and that plaintiffs were authorized at all times to advance all costs and fees of consultants on this project, incurred by and paid on behalf of defendant; plaintiffs honored periodical statements from the architect, as the work progressed, and made payment thereof in good faith, and should be reimbursed for the sums so paid which amount to $2694.18.

The total claims, recoverable by plaintiffs, amount to $16,822.48, against which sum defendant shall receive a credit for payments made on account of plaintiffs' services in the amount of $6485.65.

■ There was a genuine dispute as to the amount of plaintiffs' claim, the claim was an unliquidated one, and plaintiffs are not entitled to interest except from date of judgment.

As to the legality of the contract itself, defendant contends that preparation of the designs by plaintiffs in this case, for modernization of defendant's store was tantamount to practicing the profession of architecture in the State of Michigan, prohibited by Michigan's Public Act No. 240 of 1937, as amended, 18.84(2) M.S.A., which reads in part:

"The practice of architecture within the meaning and intent of this act includes any professional service such as consultation, investigation, evaluation, planning, design, or responsible super-

502

vision of construction, alteration or repair in connection with any public or private structures, buildings, equipment, works or projects wherein the public welfare or the safeguarding of life, health, or property is concerned or involved, when such professional service requires the application of the principles of architecture or architectural design."

Defendant further contends that under Sec. 18.84(17) of this Act, an architectural or engineering firm may engage in the practice of architecture or professional engineering only if all partners, officers, and directors of such organization shall be registered architects or registered professional engineers.

█ Plaintiffs are industrial designers, not architects, and in the opinion of this court the above cited sections are inapplicable, particularly in view of the provisions of Sec. 18.84(23) of the Act to the effect that the Act shall not be construed to affect or prevent the practice of any other legally recognized profession.

The phrase "legally recognized profession" is not defined in the Michigan Act. It would appear to be equivalent to "recognized by law." Since there is no statutory law defining the term, we must turn to judicial decisions.

Only one decision has been found which defines industrial designing as a legally recognized profession. In Teague v. Graves, 261 App.Div. 652, 27 N.Y.S.2d 762, the court said at page 763:

"Industrial Designing as a separate field of endeavor has been developed recently by a small group, which includes petitioner. However, it is now recognized by many institutions of learning. Pratt Institute, Carnegie Institute of Technology, the Universities of Illinois, Michigan and New York now include it in their curriculums. In most instances it is a four-year course leading to a degree of Bachelor of Arts in Industrial Design. California and Rhode Island also have Schools of Design. The petitioner has lectured in many of these courses. He was a member of the Board of Design of the New York World's Fair, representing Industrial Designing."

And further, 27 N.Y.S.2d on page 764:

"The profession of industrial design in its brief career has developed a technique for analyzing the function of a product, and has set up standards for judging functional fitness. It has applied these methods and standards to innumerable objects ranging from domestic and office appliances to automobiles, ships and trains; and to industrial and commercial buildings, offices and shops, and the expositions in which industry explains itself to the public. It has set up a procedure which must be followed in devising housing that shall approximate our cars in efficiency and low cost; and developing a system of transportation whereby our planes, trucks, cars, highways and railroads can be coordinated into one smoothly functioning system for the distribution of goods and people, and in creating forms of community living which shall supersede the present unworkable town and city plan. * * *

"The graduates from the universities, institutes and schools who will have scholastic degrees as Industrial Designers doubtless will be regarded as professional men. It is paradoxical that petitioner and his present associates now engaged in the field, who are lecturing in these courses and teaching these students, should be classified otherwise."

Wayne University at Detroit also offers a four-year course in Industrial Design, leading to a degree of Bachelor of Fine Arts.

The services performed by plaintiffs for defendant in this case consisted of industrial design work and not architectural work.

As to services performed by the architect Stuermer, whose employment was authorized on defendant's behalf by Rosenthal, the services rendered by him preliminary to the preparation of architectural plans and specifications consisted of sketches and

drawings which were not prepared for construction purposes; furthermore he was permitted to practice architecture in Michigan, in any event, for a period of sixty days in any calendar year, without registration, under the exemption section of the Act, Sec. 18.84(19), which authorized non-residents, who have no established place of business in this state, to practice or offer to practice in Michigan the profession of architecture or engineering when such practice does not exceed in the aggregate more than sixty days in any calendar year, provided they are legally qualified to practice in their own state and provided that state grants reciprocal privileges to architects in this state. The same provisos are included in the section authorizing registration of non-resident architects in Michigan.

Stuermer was a registered architect in Chicago, he prepared the architectural plans and specifications in his office at Chicago, and immediately sought information for purposes of registration in Michigan, preparatory to supervising any actual construction work in this state, and ultimately received his certificate of registration. It must be assumed that the necessary provisos were met, otherwise the certificate would not have been issued to him.

This court finds no violation of the Michigan Architects' Registration Act, as charged by defendant.

Under the facts outlined above, plaintiffs are entitled to a judgment in the amount of $10,336.83 with interest at the rate of 5% from date of judgment to date of payment.